## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SATCON TECHNOLOGY CORPORATION, *et al.*,[1] | Case No. 12-12869 (KG) |
| Debtors. | (Joint Administration Requested) |

### MOTION OF THE DEBTORS FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE USE OF CASH COLLATERAL, (II) GRANTING ADEQUATE PROTECTION PURSUANT TO 11 U.S.C §§ 361, 362, 363 AND 507 AND (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001(b) AND LOCAL RULE 4001-2

The above-captioned debtors and debtors-in-possession in these chapter 11 cases (collectively, the "**Debtors**"), by this motion (the "**Motion**") seek entry of an order, pursuant to sections 361, 362, 363 and 507 of title 11 of the United States Code (the "**Bankruptcy Code**"), and in accordance with Rule 4001(b) of the Federal Rules of Bankruptcy Procedures (the "**Bankruptcy Rules**") and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**"), (i) authorizing use of cash collateral on an interim basis, effective as of the Petition Date (as defined below) through the time of the final hearing on the Motion and on a final basis; (ii) granting the Debtors authority to provide interim and final adequate protection and determining that such adequate protection is adequate under the circumstances of these cases; and (iii) scheduling a final hearing on the use of cash collateral. In support of their Motion, the Debtors respectfully state as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's tax identification number or VAT number, as applicable, are: Satcon Technology Corporation (7552), Satcon Power Systems, Inc. (8804), Satcon Electronics, Inc. (4678), Satcon Power Systems (California), LLC (4644), Satcon Power Systems Canada, Ltd. (4511), Satcon International, s.r.o. (7072 - VAT) and Satcon Technology (Shenzhen) Co., Ltd. (1537 - VAT). The Debtors' address is 25 Drydock Avenue, Boston, Massachusetts, 02210.

## Status of the Case

1.    On the date hereof (the "**Petition Date**"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

2.    The Debtors have continued in possession of their properties and are operating and managing their business as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

3.    No request has been made for the appointment of a trustee or examiner and a creditors' committee has not yet been appointed in these cases.

## Jurisdiction, Venue, and Statutory Predicates

4.    The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this district pursuant to 28 U.S.C. § 1408.  This matter is core within the meaning of 28 U.S.C. § 157(b)(2).

5.    The statutory predicates for this Motion are sections 361, 362, 363 and 507 of the Bankruptcy Code, Bankruptcy Rule 4001(b) and Local Rule 4001-2.

## Background

6.    The Debtors provide utility-grade power conversion solutions for the renewable energy market, primarily for large-scale commercial and utility-scale solar photovoltaic markets. The conversion solutions that the Debtors design and deliver enable producers of renewable energy to convert clean energy into grid-connected, efficient and reliable electrical power.  The Debtors' power conversion solutions boost total system power production through system intelligence, advanced command and control capabilities, industrial-grade engineering and total lifecycle performance optimization.  The Debtors also offer system design services and solutions for management, monitoring and performance measurement to maximize capital investment and

improve overall quality and performance over the entire lifespan of a photovoltaic installation. The Debtors sell their products throughout the world although their current primary markets are North America and Asia.

7.      Since the beginning of 2011, the unexpected elimination of subsidies by European governments for solar power projects caused the Debtors' European business to almost entirely disappear while the North American and Asian markets have been buffeted by increased competition and dramatically falling prices. In response, the Debtors drastically reduced costs by closing their primary factory in Canada and shifting their production to an almost entirely outsourced model using contract manufacturers in the United States, Canada and China. Unfortunately, this downward spiral in prices led to substantial losses in written down inventory that could not be sold for the cost that it required to manufacture. Because a significant amount of inventory was specifically designed and manufactured to meet rigid standards to integrate into the European power grid that are not consistent with the standards for other grids, much of the product that had been produced for the European market could not be sold without costly alteration and continues to sit unsold in warehouse space leased by the Debtors.

8.      During the latter part of 2011 and all of 2012, as the Debtors' business contracted and their assets needed to be written down, the Debtors began to experience significant pressure to reduce their outstanding obligations to trade creditors and secured and unsecured lenders. The Debtors were able to reduce their total funded indebtedness, bank debt, trade payables and accrued expenses from approximately $157,000,000.00 as of the end of June of 2011 to approximately $72,000,000.00 at the end of June of 2012. This debt reduction resulted in the Debtors' cash position dropping from approximately $46,000,000.00 to approximately $3,000,000.00 for the same periods. The Debtors' reduced cash position began to materially

impair their ability to pay their vendors and lenders and as a result the Debtors began to experience difficulty shipping product to their customers on a timely basis.

9.    As a result of these liquidity and operational issues, the Debtors have been unable to operate at a profitable or even cash flow neutral basis for a significant period of time. The Debtors also have been unable to meet the debt service obligations on their funded debt and did not have sufficient liquidity to continue operating outside of chapter 11.

10.    A detailed factual background of the Debtors' businesses and operations, as well as the events precipitating the commencement of these cases, is more fully set forth in the *Declaration of Charles S. Rhoades in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* (the "**First Day Declaration**"), filed contemporaneously herewith and incorporated herein by reference.

## Prepetition Secured Debt

11.    On the Petition Date, the Borrower-Debtors were obligated on approximately $20.0 million of secured debt financing. The secured debt is comprised of two facilities: (i) a senior secured loan in the original principal amount of $50.0 million (which is currently outstanding in a principal amount of approximately $13.5 million); and (ii) a subordinated secured loan evidenced by two promissory notes in the original aggregate principal amount of $12.0 million (which is currently outstanding in a principal amount of approximately $6.5 million). The respective rights and obligations between and among the senior and subordinated loans are governed by their Subordination Agreements (as defined below).

**A.    Senior Secured Debt**

12.    On or about February 26, 2008, Satcon Technology Corporation ("**Satcon Technology**") and its debtor-subsidiaries Satcon Power Systems, Inc., Satcon Electronics, Inc.

and Satcon Power Systems Canada Ltd. (collectively, the "**Senior Borrowers**") entered into a Loan and Security Agreement with Silicon Valley Bank (the "**Senior Secured Creditor**") pursuant to which the Senior Secured Creditor agreed to provide the Senior Borrowers with a credit line up to $10.0 million (as amended or modified, the "**Original Senior Secured Agreement**"). The Senior Borrowers' obligations under the Original Senior Secured Agreement were secured by a first-priority security interest in substantially all of the Senior Borrowers' assets.

13.    On April 22, 2011, the Senior Borrowers entered into an amended and restated credit agreement as amended by a certain First Amendment to Amended and Restated Credit Agreement dated as of June 30, 2011, and as further amended by that certain Waiver and Second Amendment to Amended and Restated Credit Agreement dated as of August 9, 2011 (together with all other documents, instruments, and agreements related thereto and/or executed in connection therewith, the "**Senior Pre-Petition Loan Documents**") with the Senior Secured Creditor, as administrative agent, issuing lender and swingline lender, and such other lenders as set forth from time to time in the Senior Pre-Petition Loan Documents. The Senior Pre-Petition Loan Documents amended and restated the Original Senior Secured Agreement and provided for a senior secured revolving credit facility of up to $35.0 million. In addition, the Senior Pre-Petition Loan Documents provided that the Senior Borrowers could make a one-time request for an additional $15.0 million of availability (together with the revolving credit facility, the "**Senior Secured Debt**").

14.    Under the Senior Pre-Petition Loan Documents, the Senior Borrowers were obligated to execute a guarantee and collateral agreement in favor of the Senior Secured Creditor (the "**Senior Secured Guarantee**"). Under the terms of the Senior Secured Guarantee, each of

the Senior Borrowers, along with each their subsidiaries, jointly and severally, unconditionally guaranteed to the Senior Secured Creditor (as administrative agent) the performance of the Secured Obligations (as defined in the Senior Secured Guarantee). In addition, pursuant to the terms of the Senior Pre-Petition Loan Documents, the Senior Secured Debt is secured by prepetition first priority liens on, and security interests in, substantially all of the Senior Borrowers' assets (as defined in the Senior Pre-Petition Loan Documents, the "**Collateral**"). The Senior Borrowers' cash and cash equivalents, including all cash that constitutes proceeds of the Collateral are part of the Collateral and, therefore are "cash collateral" of the Senior Secured Creditor within the meaning of § 363(a) of the Bankruptcy Code (the "**Cash Collateral**"). Approximately $13.5 million was outstanding under the Senior Pre-Petition Loan Documents as of the Petition Date. A copy of the credit agreement between the Senior Borrowers and the Senior Secured Creditor, including a form of the Senior Secured Guarantee, is annexed hereto as **Exhibit "A"**.

B.      **Subordinated Debt**

15.     On or about June 16, 2010, Satcon Technology, Satcon Power Systems, Inc. and Satcon Electronics, Inc. (the "**Subordinated Borrowers**" and together with the Senior Borrowers, the "**Borrower-Debtors**"), as borrowers, and Compass Horizon Funding Company, LLC ("**CHF**"), as lender entered into that certain Venture Loan and Security Agreement (as amended, supplemented or otherwise modified or restated, the "**Subordinated Loan Agreement**" and together with all other documents, instruments, and agreements related thereto and/or executed in connection therewith, the "**Subordinated Loan Documents**"). By subsequent transfer agreements, CHF transferred (i) the secured promissory note in the original principal amount of $10.0 million to Horizon Credit I LLC ("**Horizon**") and (ii) the secured

promissory note in the original principal amount of $2.0 million to Velocity Venture Holdings, LLC, which in turn assigned such secured promissory note to Velocity Venture Funding, LLC (collectively "**Velocity**" and together with CHF, Horizon and any lenders joined to the Venture Loan and Security Agreement from time to time, the "**Subordinated Creditors**" and together with the Senior Secured Creditor, the "**Secured Creditors**" and each a "**Secured Creditor**"). Under the Subordinated Loan Agreement, *inter alia*, the Subordinated Creditors agreed to make certain loans and financial accommodations in the aggregate principal amount of up to $12.0 million as evidenced by of two notes payable (the "**Subordinated Debt**").

16.    The Subordinated Debt is secured by prepetition second priority liens on, and security interests in, the Collateral, including the Cash Collateral, which security interest is subordinate to the security interest of the Senior Secured Creditor in the Collateral.  In addition, pursuant to section 16 of the Subordinated Loan Agreement, each of the Subordinated Borrowers agreed to be jointly and severally liable for, and absolutely and unconditionally guarantee, payment and performance of all Obligations (as defined in the Subordinated Loan Agreement).

17.    Approximately $6.5 million was outstanding under the Subordinated Debt as of the Petition Date.  A copy of the Subordinated Loan Agreement is attached hereto as **Exhibit "B"**.

C.    **Subordination Agreement**

18.    The respective rights and obligations between and among the Senior Secured Creditor and the Subordinated Creditors are set forth in (i) the Amended and Restated Subordination Agreement, amended and restated as of April 22, 2011, between the Senior Secured Creditor and Horizon (the "**Horizon Subordination Agreement**") and (ii) the Amended and Restated Subordination Agreement, amended and restated as of April 22, 2011, between the

Senior Secured Creditor and Velocity (the **"Velocity Subordination Agreement"** and together with the Horizon Subordination Agreement, the **"Subordination Agreements"**).  Copies of the Horizon Subordination Agreement and the Velocity Subordination Agreement are attached hereto as **Exhibits "C" and "D"** respectively.

19.    The Subordination Agreements provide, among other things, that (i) the liens securing the Senior Secured Debt are senior in all respects and priority to any lien securing the Subordinated Debt; (ii) the liens securing the Subordinated Debt are junior and subordinate in all respects to all liens securing the Senior Secured  Debt; (iii) the Subordinated Creditors' right to payment is subordinated to the Senior Secured Creditor's right to payment; and (iv) for so long as any part of the Senior Secured Debt remains outstanding or the applicable Senior Pre-Petition Loan Documents remain in effect and not terminated, the Subordinated Creditors are prohibited from (a) demanding or receiving from the Borrower-Debtors all or any part of the Subordinated Debt, (b) exercising any right or remedy, or taking any enforcement action regarding any property or assets of the Borrower-Debtors, or (c) commencing, or causing to be commenced, prosecuting or participating in any administrative, legal equitable action against the Borrower-Debtors or the Collateral.  *See* Subordination Agreements, at Sections 1-3.  In addition, section 8 of the Subordination Agreements provides that the Subordinated Creditors irrevocably appoint the Senior Secured Creditor as their attorney in fact, and grant to the Senior Secured Creditor a power of attorney with full power of substitution, in the name of the Subordinated Creditors or in the name of Senior Secured Creditor, for the use and benefit of the Senior Secured Creditor, without notice to the Subordinated Creditors, in any bankruptcy, insolvency or similar proceeding involving the Borrower-Debtors to file the appropriate claim or claims in respect of

the Subordinated Debt on behalf of the Subordinated Creditors if they do not do so prior to thirty (30) days before the expiration of the time to file claims in such proceeding.

### Relief Requested

20.     By this Motion, the Debtors seek emergency interim authorization to use Cash Collateral subject to a budget for the purpose of avoiding immediate and irreparable harm to the Debtors' respective bankruptcy estates pending a final hearing, and further authorization pursuant to a final order on the Motion. In consideration for use of Cash Collateral, the Debtors seek authority from the Court for to grant the Secured Creditors adequate protection and a determination that such adequate protection is adequate under the circumstances of these cases. Further, the Debtors request that the Court schedule a final hearing on the use of Cash Collateral and, following such a hearing, enter a final order authorizing use of Cash Collateral.

21.     The Debtors propose to use the Cash Collateral immediately following the Court's entry of an interim order authorizing such use for general and administrative expenses related to the Debtors' operation of their businesses in the ordinary course and the administration of their bankruptcy estates, the vast majority of which shall be used to preserve and maintain the value of the Debtors' operations. The Debtors' proposed use of Cash Collateral is for the purposes and amounts set forth in the Interim Budget, attached hereto as **Exhibit "E"** (the "**Interim Budget**" and any subsequent budget, a "**Budget**") and incorporated herein and subject to the terms and conditions detailed in the proposed Interim Order, attached hereto as **Exhibit "F"** (the "**Proposed Interim Order**").

22.     Bankruptcy Code section 363(c)(2) provides that a debtor in possession may not use cash collateral unless an entity that has an interest in such cash collateral consents or the court approves the use, conditioned on the provision of adequate protection. 11 U.S.C. §

363(c)(2).   Section 363(p) further provides that at a hearing on the use of cash collateral, the party asserting an interest in such cash collateral has the burden of proof on the issues of the validity, priority, or extent of such interest, and the debtor in possession has the burden of proof as to the issue of adequate protection.  11 U.S.C. § 363(p).  Bankruptcy Rule 4001(b)(2) provides that a court may not hold a final hearing on a motion to use cash collateral earlier than fourteen (14) days after service of such motion, but may authorize the use of cash collateral prior to a final hearing as necessary to avoid immediate and irreparable harm to the debtor's estate pending a final hearing.  Fed. R. Bankr. P. 4001(b)(2).

23.    The Debtors recognize that it is likely that the Secured Creditors assert an entitlement to adequate protection of the security interests in the Collateral within the meaning of sections 361 and 363 of the Bankruptcy Code.

24.    In consideration for the Debtors' use of the Cash Collateral, the Debtors propose to grant the Adequate Protection (defined below) to the Secured Creditors to the extent of any diminution of the value of their respective interests in the Collateral, in the form of additional and replacement security interests in and liens in all of the Debtors' pre-petition and post-petition assets of every kind, nature, and description, tangible and intangible, now existing or hereafter arising, including, but not limited to, all contracts, all accounts, inventory, equipment, general intangibles, goods, motor vehicles, real estate, and the proceeds of leasehold interests (but not the leaseholds themselves), as well as all products and proceeds thereof (collectively, the "**Post-Petition Collateral**").

25.    The Adequate Protection Liens (defined below) granted to the Secured Creditors in connection with the Debtors' use of Cash Collateral shall be subject to the Carve-Out (as defined in the Proposed Interim Order), and shall be valid and perfected without the need for the

execution or filing of any further documents or instruments.

26.    The Debtors' ability to use the Cash Collateral is critical to the Debtors' ability to continue operations as a going concern during the course of these chapter 11 cases and, ultimately, to implement their restructuring plan.  The Cash Collateral will be used to fund ongoing working capital needs, including, but not limited to employee payroll expenses, certain obligations to the Debtors' vendors, suppliers, customers, and taxing and regulatory authorities, fees payable to the United States Trustee, fees and expenses of professionals retained at the expense of the estates, and other costs of administering the Debtors' estates.

27.    The Debtors currently are not seeking post-petition financing.  Thus, the Cash Collateral is the Debtors' sole source of funding for their operations and the costs of administering the chapter 11 process.  Simply put, the Debtors do not have sufficient available sources of working capital and financing to carry on the normal course operation of their businesses without use of the Cash Collateral.  The Debtors' ability to maintain business relationships with their vendors, suppliers, and customers, and to finance their day-to-day operations, is essential to the Debtors' continued viability and the Debtors cannot do this without the use of Cash Collateral.  For these reasons, the Debtors' need for use of Cash Collateral is critical and immediate.  In the absence of the use of Cash Collateral, the continued operation of the Debtors' businesses would not be possible and serious and irreparable harm to the Debtors and their estates would occur; the Debtors would immediately cease operations which, in turn, would cause an immediate and pronounced deterioration in the value of the Debtors' business. Therefore, the Court should authorize the use of Cash Collateral on an interim and, following a final hearing, final basis.

## Essential Terms of the Proposed Use of Cash Collateral

28.     Consistent with Bankruptcy Rule 4001(b)(1) and the requirements of Local Rule 4001-2(a)(i) and (ii), the Debtors hereby highlight certain provisions in the Proposed Interim Order and provide a summary of the essential terms of the proposed use of Cash Collateral and description of the Adequate Protection as follows:

(a)     **Use of Cash Collateral:**  Pursuant to ¶ 2 of the Proposed Interim Order, the Debtors seek to continue use of Cash Collateral during the "**Interim Period**" solely on the terms, for the purposes, and in the amounts set forth in the Interim Budget (subject to the variances permitted under the Proposed Interim Order). Notwithstanding the foregoing, (a) the Debtors shall be permitted to exceed the disbursements on a line item or aggregate basis provided that such amounts do not exceed by 110% of the amount provided in such line item or in the aggregate as applicable and (b) the Debtors compliance with the Interim Budget shall be measured on cumulative basis and amounts in a line item that are unused in one week may be rolled-forward to subsequent weeks. In addition, the Debtors shall not use funds allocated to a particular line item in the Interim Budget (including the line item denominated "Other Operating Disbursements" or words of similar import) to pay any expenses under any other line items in the Interim Budget without the prior express written consent of the Senior Secured Creditor.

(b)     **Grant of Adequate Protection to Secured Creditors:**  Pursuant to ¶ 4 of the Proposed Interim Order, in consideration of the Debtors' use of the Secured Creditors' Collateral and Cash Collateral in accordance with the Interim Budget and the other terms and provisions of the Proposed Interim Order, the Secured Creditors shall granted the following "adequate protection" (collectively, the "**Adequate Protection**") in consideration for the use of their Collateral and Cash Collateral from and after the Petition Date, including any diminution in the value thereof:

(i)     Post-Petition Adequate Protection Liens.  Pursuant to Sections 361(2), 362, 363(c)(2), and 363(e) of the Bankruptcy Code, the Senior Secured Creditor will be granted replacement liens (collectively, the "**Senior Adequate Protection Lien**"), to the extent of any diminution in value of the Collateral and Cash Collateral,

in the Post-Petition Collateral. The post-petition grant of the foregoing Senior Adequate Protection Lien shall be supplemental to and in addition to, the security interest which the Senior Secured Creditor possesses pursuant to the Senior Pre-Petition Loan Documents.

The Subordinated Secured Creditors are will be granted replacement liens (collectively, the **"Subordinated Adequate Protection Liens"** and together with the Senior Adequate Protection Lien, the "**Adequate Protection Liens**") to the extent of any diminution in value of the Collateral and Cash Collateral, in all of the Post-Petition Collateral, which Subordinated Adequate Protection Lien shall be subordinated in priority to the Senior Adequate Protection Lien to the same extent provided in the Subordination Agreements. The post-petition grant of the foregoing Subordinated Adequate Protection Lien shall be supplemental to and in addition to, the security interest which the Subordinated Secured Creditors possess pursuant to the Subordinated Loan Documents.

(ii)    <u>Post-Petition Interest.</u> As additional adequate protection, the Debtors, without further order of or application to the Court, are directed and authorized to pay post-petition interest on and after the Petition Date with respect to the Senior Secured Creditor's Claim at the contractual default rate and at the times set forth in the applicable Senior Pre-Petition Loan Documents, subject to the Debtors' 506(b) Rights (as defined in the Proposed Interim Order).

(iii)    <u>Payment of Principal.</u> As additional adequate protection and, subject to ¶ 5 of the Proposed Interim Order, during the Debtors' chapter 11 cases and on each Measurement Date (as defined below), the Senior Secured Creditor is hereby authorized to apply Excess Cash Collateral (as defined below), if any, as a permanent, partial principal reduction and payment toward the Senior Secured Creditor's Claim. For purposes of the Proposed Interim Order, "**Excess Cash Collateral**" shall mean the amount by which the aggregate cash balance in the Debtors' accounts at the close of business on any Measurement Date (net of any uncashed checks issued in the post-petition period or authorized to be honored for pre-petition period) or any other disbursements that have not been charged against the Debtors' accounts exceeds $5,700,000.00, and "**Measurement Date**" shall mean

each Tuesday during these cases (or if not a business day, then the next succeeding business day thereafter) commencing on Tuesday, November 6, 2012.

(iv)   <u>Senior Secured Creditor's Post-Petition Costs and Expenses</u>. As additional adequate protection, and without further order of or application to the Court, the Debtors are directed and authorized to pay each month the post-petition out-of-pocket fees, costs, and expenses incurred by the Senior Secured Creditor (including, without limitation, reasonable fees and expenses of counsel) during the immediately preceding month. Each such payment shall be made within ten (10) days of submission of a copy of each invoice (redacted as may be necessary to preserve confidential communication and matters subject to the attorney work product doctrine) to the Debtors and the Debtors' counsel, and the Debtors or the Debtors' counsel shall in turn deliver copies of those invoices to the Office of the United States Trustee (the "**U.S. Trustee**"), counsel for the Subordinated Secured Creditor and the Committee, if any. Payment of fees and expenses shall not be subject to allowance by the Court, and professionals engaged by the Senior Secured Creditor shall not be required to comply with the U.S. Trustee fee guidelines. The Debtors may withhold payment of only those amounts properly disputed, and any dispute as to the reasonableness of such fees, costs, and expenses shall be subject to the jurisdiction of this Court.

(v)    <u>Superpriority Claims.</u> Subject to the Carve-Out and the fees of the U.S. Trustee required to be paid in these Chapter 11 Cases, if, and to the extent that, the Adequate Protection Liens and the Adequate Protection described herein are insufficient to provide adequate protection to the Secured Creditors for any diminution in the value of their interests in their respective Collateral and Cash Collateral from and after the Petition Date, each Secured Creditor is hereby granted allowed superpriority claims against the Debtors' estates pursuant to § 507(b) of the Bankruptcy Code (the "**Secured Creditors' Superpriority Claims**"), with priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, §§ 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), 1113 and 1114 of the Bankruptcy Code, and shall at all times be senior to the

rights of the Debtors, and any successor trustee or any creditor, in the Chapter 11 Cases or any subsequent proceedings under the Bankruptcy Code; provided that the superiority claim of the Subordinated Secured Creditors shall be subordinate to the same extent provided in the Subordination Agreements. Subject to the Carve-Out and the fees of the U.S. Trustee required to be paid in these Chapter 11 Cases, , no cost or expense of administration asserted against the Debtors' estates under §§ 105, 503(b) and 507(b) of the Bankruptcy Code shall be senior to, or *pari passu* with, the Secured Creditors' Superpriority Claims.

(c) **Carve-Out:** The Proposed Interim Order details the priority, extent, terms and conditions of the Carve-Out. (See ¶ 4(f) of the Proposed Interim Order).

(i) <u>Payment of Carve-Out</u>. Until the Termination (defined in ¶ 2(e) of the Proposed Interim Order), the Debtors are authorized and directed, without further Order of this Court and at the times provided in the Proposed Order, to deposit into an account maintained by Debtors' counsel or other party designated by the Debtors an amount equal to the line items identified in the Interim Budget (collectively the "**Bankruptcy Fees**") under the line items for Retained Professionals (such account the "**Professional Fee Account**"), which amounts are part of the Carve-Out. The initial deposit into the Professional Fee Account shall be made promptly after entry of this Interim Order for the aggregate amount of such Bankruptcy Fees shown in the Budget for the period from the Petition Date through and including the date of the entry of this Interim Order. Thereafter, such amounts will be deposited weekly in advance into the Professional Fee Account. Proceeds deposited into the Professional Fee Account shall be held for purposes of paying allowed fees and expenses of the Retained Professionals (defined in ¶4(f)(1) of the Proposed Interim Order and which fees and expenses are allowed by order of this Court (as to which the parties' rights are expressly reserved). Any portion of the Professional Fee Account not used to pay allowed fees and expenses of Retained Professionals shall be remitted to the Debtors' estates or their successor (subject to rights of the Secured Creditors) after payment in full of all allowed fees and expenses of Retained Professionals which are part of the Carve-Out. The foregoing amounts

may be paid from the Professional Fee Account notwithstanding a Termination.

**Basis for Relief Requested**

A.    **Debtors' Need to Use Cash Collateral to Avoid Immediate and Irreparable Harm to their Properties and Estates**

29.    The availability to the Debtors of sufficient working capital, liquidity, and other financial accommodations are vital to their ability to continue their operations. Court approval of the use of Cash Collateral is critical to the Debtors' efforts to reorganize and maximize value for their estates, employees and creditors.

30.    The Debtors' need to use Cash Collateral is immediate and critical to enable the Debtors to administer their Chapter 11 Cases generally, continue to operate their businesses in the normal course, and preserve the value of their estates for all stakeholders. The ability of the Debtors to finance operations, maintain business relationships with customers, pay employees, and otherwise finance operations throughout the Chapter 11 Cases requires the availability of working capital from the use of Cash Collateral, the absence of which would immediately and irreparably harm the Debtors, their estates, and their stakeholders. The Debtors do not have sufficient available sources of working capital and financing to operate their businesses or maintain their properties in the ordinary course of business without the authorized use of Cash Collateral.

31.    Absent obtaining use of Cash Collateral, the Debtors' businesses will be shut down, their ability to reorganize or realize going concern value in their enterprises will be hindered, and serious and irreparable harm to the Debtors, their estates and their creditors and equity holders will occur. The preservation and maintenance of the Debtors' businesses and their assets is necessary to maximize returns for all creditors, and is significant and necessary to a

successful resolution of these cases.

**B.      The Court Should Approve the Motion Because
the Secured Creditors Have Been Adequately Protected**

32.      The Debtors propose to provide adequate protection as contemplated by sections
361 and 363(c)(2) of the Bankruptcy Code and hereby seek the Court's approval thereof.
Further, the Debtors seek a determination that the adequate protection proposed and to be
provided under the Proposed Interim Order and Final Order is adequate under the circumstances
of these cases.  The Bankruptcy Code does not explicitly define "adequate protection," but does
provide a non exclusive list of the means by which a debtor may provide adequate protection,
including "other relief" resulting in the "indubitable equivalent" of the secured creditor's interest
in such property.  11 U.S.C. § 361.  What constitutes adequate protection must be evaluated on a
case by case basis.  In re Swedeland Dev. Group, Inc., 16 F.3d 552, 564 (3d Cir. 1994) (citing In
re O'Connor, 808 F.2d 1393, 1396 97 (10th Cir. 1987)); In re Martin, 761 F.2d 472, 476 (8th Cir.
1985).

33.      Adequate protection is meant to ensure that secured lenders receive the value for
which they originally bargained.  In re Swedeland, 16 F.3d at 564 (citing O'Connor, 808 F.2d at
1396) ("[T]he whole purpose of adequate protection for a creditor is to ensure that the creditor
receives the value for which he bargained pre bankruptcy").  Courts have also noted that the
"essence of adequate protection is the assurance of the maintenance and continued recoverability
of the lien value during the interim between the filing, and the confirmation."  In re Arriens, 25
B.R. 79, 81 (Bankr. D. Or. 1982).  The purpose of the adequate protection requirement is to
protect secured creditors from diminution in value from the debtor's use of the collateral during
the administration of its case.  See In re Kain, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); In re

Becker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); In re Ledgmere Land Corp., 116 B.R. 338, 343 (Bankr. D. Mass. 1990).

34.    In these cases, the Debtors' request for use of Cash Collateral and the protections proposed under this Motion and described in greater detail in the Proposed Interim Order, under the circumstances, are reasonable, appropriate and sufficient to satisfy the standard of "adequate protection" and maintain the value of the Collateral.

**C.    The Use of Cash Collateral Will Preserve the Value of the Debtors' Assets and Secured Creditors' Collateral**

35.    If the Debtors are not authorized to use Cash Collateral, the Debtors' businesses will shut down. The use of Cash Collateral, therefore, is critical to the Debtors' ability to operate their businesses going forward and to maximize the value of their assets for the benefit of their creditors.

36.    Pursuant to section 363(c)(2) of the Bankruptcy Code a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). As set forth in the First Day Declaration, the Debtors engaged in discussions with the Senior Secured prior to the Petition Date and expect that the Senior Secured Creditor will consent to the Debtors' use of Cash Collateral as requested herein. However, as of the date hereof, the Senior Secured Creditor has not agreed to the form of Interim Order attached as **Exhibit "F"** hereto. Pursuant to the terms of the Subordination Agreements, should the Senior Secured Creditor consent to the Debtors' use of Cash Collateral, the Subordinated Creditors are deemed to have consented to the relief granted Interim Order. However, if the Debtors are unable to secure the Senior Secured Creditor's consent to their use of

Cash Collateral, the Debtors submit that they, nevertheless, satisfy the requirements for the relief requested herein.

37.    It is well established that a bankruptcy court, if possible, should resolve issues in favor of preserving a debtor's business as a going concern. See, e.g., In re George Ruggiere Chrysler Plymouth, Inc., 727 F.2d 1017, 1019 (11th Cir. 1984) ("A debtor, attempting to reorganize a business under chapter 11, clearly has a compelling need to use 'cash collateral' in its effort to rebuild. Without the availability of cash . . . the congressional policy favoring rehabilitation over economic failure would be frustrated.").

38.    As discussed above, the Debtors propose to use Cash Collateral, in the ordinary course of their businesses and to fund the administration of their cases, on an interim basis pending a final hearing. If the Debtors cannot use Cash Collateral during the interim period, they will have insufficient cash to sustain their day to day operations, will have to shut down operations and may be forced to convert these chapter 11 cases to chapter 7. The cessation of business operations will irreparably harm the value of the Debtors' assets. The Debtors' use of Cash Collateral will allow the Debtors to maintain operations and preserve (and likely enhance) the value of their businesses and properties, and thereby, the value of their estates.

39.    Further, the Debtors submit that it is appropriate to allow the four (4) Borrower-Debtors to use the Cash Collateral to fund the payroll and operating expenses of the three (3) non-Borrower-Debtors.  The Debtors operate on a global basis as do their customers and suppliers. Specifically, (i) Satcon Power Systems (California) LLC is responsible for managing the Debtors' worldwide sales and service, (ii) Satcon Technology (Shenzhen) Co., Ltd. manages the Debtors' relationship with Great Wall Energy, which supplies the Debtors with more than ninety percent (90%) of the Debtors' product, and (iii) Satcon International, s.r.o. manages the

Debtors' European operations, which account for up to fifteen percent (15%) of the Debtors' sales. Moreover, the Borrower-Debtors' equity interests in the non-Borrower-Debtors are included in the Collateral. As a result, maintaining the value of the non-Borrower-Debtors is important to maintaining the value of the Secured Creditors' collateral.

40.     For these reasons, it is critical to the success of the Debtors' restructuring efforts to continue funding the non-Borrower-Debtors. These entities serve the important functions of supporting the Debtors' customers, honoring the Debtors' existing warranty obligations and managing the Debtors' supply chain and contract manufacturers. Absent funding of the non-Borrower-Debtors, the Debtors' worldwide operations will be crippled.

**D.      Interim Approval for the Use of Cash Collateral Should Be Granted and a Final Hearing Should Be Scheduled**

41.     Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use cash collateral may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

42.     Pursuant to Bankruptcy Rule 4001(b), the Debtors request that the Court conduct an expedited preliminary hearing on the Motion and on an interim basis (a) authorize the Debtors to use the Cash Collateral in order to (i) maintain and finance the ongoing operations of the Debtors and the administration of their estates, and (ii) avoid immediate and irreparable harm and prejudice to the Debtors' estates and all parties in interest, and (b) schedule a Final Hearing

43.     In furtherance of this request, the Debtors shall, within three (3) business days of the entry of the Interim Order by the Court, serve by overnight mail, a copy of this Motion with

its attachments, a copy of the entered Interim Order, and a notice of the Final Hearing on the date established by the Court on:  (i) the Office of the United States Trustee; (ii) counsel to the Secured Creditors; (iii) creditors holding the thirty (30) largest unsecured claims as set forth in the consolidated list filed with the Debtors' petitions; (iv) the Office of the United States Attorney General for the District of Delaware; (v) the Internal Revenue Service; (vi) the Securities and Exchange Commission and (vii) the proposed information officer in connection with the Canadian Proceedings

44.    The Debtors further request that any party in interest who objects to the relief sought at the Final Hearing be required to file an objection, which objection shall:  (i) be in writing; (ii) conform to the Bankruptcy Rules and the Local Rules; and (iii) be filed with the Clerk of the United States Bankruptcy Court for the District of Delaware and served upon the following parties no later than fourteen (14) days from the date of the entry of the Interim Order: (i) proposed counsel to the Debtors; (ii) the Office of the United States Trustee; and (iii) the Secured Creditors.

45.    Accordingly, the Debtors respectfully request that the Court schedule the Final Hearing on this Motion at the Court's convenience no sooner than fourteen (14) days following the entry of the Interim Order.  Such relief is necessary in order to maintain and preserve the ongoing operations and avoid immediate and irreparable harm and prejudice to the Debtors' respective estates.

## Notice

46.    Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known:  (a) the Office of the United States Trustee for the District of Delaware; (b) counsel to the Debtors' Secured Creditors; (c) creditors holding the thirty (30) largest

unsecured claims as set forth in the consolidated list filed with the Debtors' petitions; (d) those parties requesting notice pursuant to Rule 2002; (e) the Office of the United States Attorney General for the District of Delaware; (f) the Internal Revenue Service; (g) the Securities and Exchange Commission and (h) and (i) the proposed information officer in connection with the Canadian Proceedings.  As the Motion is seeking "first day" relief, within two (2) business days of the hearing on the Motion, the Debtors will serve copies of the Motion and any order entered respecting the Motion in accordance with the Local Rules.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

### No Prior Request

47.    No prior request for the relief sought in this Motion has been made to this or any other court.

### Conclusion

WHEREFORE, the Debtors request entry of an order, substantially in the form attached hereto, (i) authorizing the Debtors' use of cash collateral on an interim basis, effective as of the Petition Date (as defined below) through the time of the final hearing on the Motion and on a final basis; (ii) granting the Debtors authority to provide interim and final adequate protection and determining that such adequate protection is adequate under the circumstances of these cases; and (iii) scheduling a final hearing on the use of cash collateral and (iv) providing such other and further relief the Court deems just and proper.

Dated:  October 17, 2012

GREENBERG TRAURIG, LLP

/s/ Dennis A. Meloro
Dennis A. Meloro (DE Bar No. 4435)
The Nemours Building
1007 North Orange Street, Suite 1200
Wilmington, Delaware 19801
Telephone:  (302) 661-7000
Facsimile:  (302) 661-7360
Email: melorod@gtlaw.com

-and-

Nancy A. Mitchell (*pro hac vice pending*)
Maria J. DiConza (*pro hac vice pending*)
Burke A. Dunphy (*pro hac vice pending*)
Matthew L. Hinker (DE Bar No. 5348)
Sohyoung Choo Ward (*pro hac vice pending*)
200 Park Avenue
New York, New York 10166
Telephone:  (212) 801-9200
Facsimile:  (212) 801-6400
Email: mitchelln@gtlaw.com
        diconzam@gtlaw.com
        dunphyb@gtlaw.com
        hinkerm@gtlaw.com
        wards@gtlaw.com

Proposed Counsel for the Debtors
and Debtors-in-Possession