UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In Re:<br><br>SATCON TECHNOLOGY<br>CORPORATION, et al.,<br><br>Debtors | Chapter 11<br><br>Case No. 12-12869 (KG)<br>Jointly Administered<br><br>**Re: D.I. 18, 139**<br><br>Hearing Date: Nov. 29, 2012 at 9:30 a.m. |

**JOINT OBJECTION AND SUPPLEMENTAL OBJECTION OF SECURED
CREDITORS SILICON VALLEY BANK, HORIZON CREDIT I LLC, AND VELOCITY
VENTURE FUNDING, LLC TO (A) MOTION OF THE DEBTORS FOR ENTRY OF
FINAL ORDER AUTHORIZING THE USE OF CASH COLLATERAL AND (B)
EMERGENCY MOTION OF THE DEBTORS FOR ENTRY OF AN ORDER
AUTHORIZING (I) ENTRY INTO A SETTLEMENT WITH GREAT WALL, (II)
INCURRENCE OF POST-PETITION TRADE CREDIT, AND (III) GRANTING OF A
PRIMING LIEN TO SECURE POST-PETITION TRADE CREDIT**

Silicon Valley Bank (the "Senior Secured Creditor") and Horizon Credit I LLC and

Velocity Venture Funding, LLC (together, the "Subordinated Secured Creditors," and with the

Senior Secured Creditor, the "Secured Creditors"), by and through their undersigned counsel,

hereby file this joint objection to (A) the *Motion of the Debtors for Entry of Final Order (I)

Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection Pursuant to 11

U.S.C. §§361, 362, 363 and 507* [D.I. 18] (the "Cash Collateral Motion"); and (B) the

*Emergency Motion of the Debtors for Entry of an Order Authorizing (i) Entry into a Settlement

with Great Wall, (ii) Incurrence of Post-Petition Trade Credit, and (iii) Granting of a Priming

Lien to Secure Post-Petition Trade Credit* [D.I. 139] (the "Great Wall Motion").[1]  In support of

this objection, the Secured Creditors incorporate by reference the objection to the Cash Collateral

Motion and the Great Wall Motion [D.I. 163] previously filed by the Subordinated Secured

Creditors as if set forth in full herein, and respectfully represent as follows:

---

[1] Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Cash Collateral
Motion and the Great Wall Motion.

## PRELIMINARY STATEMENT

1.      The Debtors seek the extraordinary relief in the Great Wall Motion of a non-consensual priming of the Secured Creditors' liens with a new lien to be granted in favor of Perfect Galaxy International Limited ("Perfect Galaxy") and China Electronics Great Wall Energy (Shenzhen) Co., Ltd (f/k/a Excellstor Greatwall Information Production (Shenzhen) Ltd) ("Great Wall").[2]  The Debtors seek to prime the Secured Creditors' liens in a transaction which removes over $6,200,000.00 of value from the Estates and subordinates the Secured Creditors' liens to an additional $5,000,000.00,[3] without any adequate protection to the Secured Creditors, and without satisfying the Debtors' heavy burden of proof.  Rather, based on (x) an inadequate liquidation analysis and (y) a flawed going concern valuation, the Debtors contend that there is sufficient equity cushion for the Secured Creditors notwithstanding the Debtors' continually deteriorating performance, notwithstanding the Debtors' inability to come even remotely close to meeting their projections, notwithstanding the Debtors' continuous bleeding of cash, and with no demonstrated prospect of "righting the Debtors' ship".

2.      The Debtors have not made the strong demonstration required by the Third Circuit and by this Court to support a non-consensual priming lien.  In seeking to prime the Secured Creditors' liens, and in seeking to delay the sale process for some forty-five days, the Debtors seek to transfer all risk of the Debtors' operations, and their speculative sale or liquidation, to the Secured Creditors.  Ironically, Great Wall, which certainly knows the Debtors' business very well, obviously does not feel that the Debtors have a sufficient cushion to protect Great Wall without being granted a priming lien.  If the Debtors do not complete their "Hail

---

[2] The Great Wall Motion often fails to distinguish between obligations to and from Great Wall and those to and from Perfect Galaxy.  Without waiving the concern that more detail needs to be supplied, the Secured Creditors will use the term "Great Wall" to collectively refer to Perfect Galaxy and Great Wall.

[3] While the Debtors estimate that the priming lien would secure approximately $5,000,000.00 in advances, there is no limit on the amount and the Debtors seek Court authorization of an unlimited priming lien.

Mary pass" contemplated in the going concern valuation, the Great Wall Motion will lead to a loss for the Secured Creditors and an administratively insolvent estate.  Until the Great Wall Motion was filed on an emergency basis seeking final relief with only two days' notice (despite the Debtors having been involved in negotiations with Great Wall since at least October 23[4]), the Secured Creditors have been supportive of the Debtors and their administration of this case. While the Secured Creditors would like to continue to work with the Debtors in a constructive fashion, under these circumstances, the risk foisted on the Secured Creditors by the Debtors in the Great Wall Motion is too great.  The Great Wall Motion does not comply with Section 364(d) of the Bankruptcy Code and must be denied.

3.      The Secured Creditors are entitled to adequate protection against any and all injury caused by the priming lien, and to receive the bargain of their pre-petition loan agreement with the Debtors, in the event that future events prove the Debtors wrong in their self-serving projections.  Giving adequate protection liens to the Secured Creditors on assets that already secure those loans would be an illusory grant of adequate protection (i.e. if it is the priming lien that causes the Secured Creditors to become undersecured, having an adequate protection lien behind the priming lien would be of no value).  Furthermore, the Court has previously granted adequate protection to the Secured Creditors in three interim orders entered by the Court.  In approximately six weeks since the commencement of these cases, the Debtors' accounts receivable aged less than 90 days have declined by approximately $5.24 million.  Under § 364(e) of the Bankruptcy Code, the Secured Creditors cannot be retroactively stripped of the adequate protection previously granted in the Interim Orders to secure this diminution in value.  In short, these adequate protection liens cannot be subordinated to a Great Wall priming lien.

---

[4] The bulk of the agreement between Great Wall and the Debtors was negotiated at a three day meeting at the Debtors' office in Boston from October 24 – 26, more than two weeks before the "emergency" motion was filed by the Debtors without any prior advice of any kind to the Secured Creditors.

4.     Among other things, the Debtors' proposed agreement with Great Wall unwisely removes substantial assets from the Debtors' Estates, in addition to unfairly imposing the proposed $5,000,000.00 priming lien, but the Debtors will only receive $3,800,000.00 of net post-petition credit.  The Great Wall Motion also proposes to also transfer over $5,000,000.00 of the Debtors' inventory (most of it at only 85% of the Debtors' cost) for no payment by Great Wall (who will credit the $5,000,000.00 "purchase price" against Great Wall's pre-petition unsecured claim against the Debtors). (The Secured Creditors suggest that that pre-petition claim is largely if not completely valueless).  Similarly, Great Wall is re-crediting "approximately" $1,200,000.00 million of the Debtors' post-petition payments made to Great Wall as payments on its (again, largely valueless) pre-petition claim.  The net effect of these two components of the Great Wall agreement is essentially a gift by the Debtors to Great Wall of more than $6.2 million, as well as a reinstatement (after reversing post-petition payments and allocating them to the pre-petition unsecured claim of Great Wall) of a post-petition claim by Great Wall in the amount of $1.2 million as a portion of its claim secured by the proposed priming lien.  Still further, the proposed agreement allows Great Wall to allocate $3.3 million of the Debtors' future payments to Great Wall's pre-petition unsecured claim, another gift to Great Wall.  Making the exchange even more one-sided in favor of Great Wall, the Debtors are also agreeing to make the Debtors' source code available to and effectively under the control of Great Wall, without clearly defining the parties' respective rights and without even clearly defining what IP is being given to Great Wall.  Granting the source code to Great Wall could well impair the value of the Debtors' remaining assets on liquidation, and could chill any proposed going concern sale.[5]    The

---

[5] It should also be noted that despite the statements of Great Wall's counsel to the contrary at the November 15, 2012 hearing, the shut down of the manufacturing facility for the Debtors in China by Great Wall does not effectively put Great Wall out of business, and the Debtors are not Great Wall's "sole source" of business.  Perfect

purported benefit to the Debtors from their receipt of additional inventory from Great Wall is also unquantified; where typically it takes ninety (90) days from commencement of manufacturing to date of payment by the customer[6], any value would be received after conclusion of even the Debtors' proposed newly extended time line for a sale and beyond any time frame that would provide the Secured Creditors with adequate protection.

5.     In claiming that the Secured Creditors have a substantial equity cushion, the Debtors rely on a defective liquidation analysis as of November 7, 2012, attached to the Declaration of the Debtors' Chief Executive Officer, Charles S. Rhoades (the "Rhoades Declaration").  As an initial matter, Mr. Rhoades does not have the qualifications to testify to the Debtors' liquidation values.  The asserted liquidation values are inflated, and do not have a sufficient basis in fact.  The analysis also assumes an incorrect date for the commencement of a hypothetical liquidation sale, which has a material impact on the conclusions as to the value of the assets.  The Debtors previously proposed a sale deadline of January 15, 2013, which the Secured Creditors agreed to and which was incorporated into the Interim Cash Collateral Orders in this case.  The Debtors now seek to change that date to early March, 2013.  However, Mr. Rhoades assumes a November 7, 2012 date for his liquidation analysis, and, if current trends continue, the age of the Debtors' accounts receivable and the saleability of the Debtors' remaining inventory would decline significantly and materially adversely in the next ninety (90) days.[7]

---

Galaxy and Great Wall are part of a substantial conglomerate, owned at least in significant part by the Chinese government, with numerous facilities and roughly $30,000,000,000.00 of annual sales.
[6] The Debtors' CEO testified at his deposition that the average pay cycle on accounts receivable is 122 days, so ninety (90) days is optimistic.
[7] In response to the Rhoades liquidation value, while reserving all objections and rights, the Senior Secured Creditor has retained Hilco Appraisal Services to prepare an expert report on the liquidation value of the Debtors.  Due to the expedited timetable for the Great Wall Motion, Hilco has not yet completed its due diligence work and its report.  It is expected that Hilco will complete its work in sufficient time to testify at its deposition on November 28, 2012, and to testify at the hearing on November 29, 2012.

6.    After the November 15 hearing, the Debtors shifted gears and recently provided the Secured Creditors with valuation by Lazard Middle Market LLC ("Lazard") which claims a going concern enterprise value of the Debtors in the range of $36,000,000.00 to $42,000,000.00. However, the Lazard report relies exclusively on the Debtor for all projections of future financial performance.  In particular, the Lazard report relies on without questioning the reasonableness or the underlying basis, the Debtors' assumption that notwithstanding negative "EBITDA" of $31,800,000.00 in 2011, and notwithstanding projected negative EBITDA of $26,900,000.00 in 2012, the Debtor is going to make a miraculous turn around, generating positive EBITDA of $8,900,000.00 in 2013, positive EBITDA of $20,200,000.00 in 2014 and positive EBITDA of $39,400,000.00 in 2015.  The Lazard report contains a number of additional "qualifications" such as acknowledging that the Debtors' industry is facing significant challenges, and acknowledging that instability and uncertainty of future government incentives could adversely impact Lazard's conclusions.  Based on the Debtors' actual performance over the last two years,[8] management's proposed projection of an immediate and drastically improved turn around, with significant future positive EBITDA in the next three years, appears to be little more than a pipe dream, and renders the conclusions in the Lazard report as to valuation of the Debtors' business as a going concern highly speculative.  The Lazard report certainly falls far short of the showing required to carry the Debtors' burden in a priming dispute.

7.    The Secured Creditors also object to the Debtors' request to extend the date by which a sale must be conducted from January 15, 2013 (the date previously proposed by the Debtors and agreed to by the Secured Creditors) to early March, 2013.  The Debtors and Lazard have been trying to sell or recapitalize the Debtors for over a year, with no success.  There is no

---

[8] The Debtors' CEO, Mr. Rhoades also admitted that the Debtors had projected positive EBITDA for both 2011 and 2012, so the Debtors' track record in meeting their projections is a poor one.

reason to believe that an additional 45 days will make a material difference.  Instead, as the Debtors' business continues to deteriorate, there is a substantial risk that by March, 2013, these extensions will have a significant adverse impact on the value of the Debtors' assets.

8.     The Secured Creditors also object to the Cash Collateral Motion, as the Debtors now seek to have the Court dramatically change the consensual Interim Orders previously entered by the Court.  Further, where the Secured Creditors believe that they are not adequately protected in the event that the Great Wall Motion is approved by the Court, the Secured Creditors are not agreeable to the added risk of the carve-outs contained in the Interim Orders. No carve out can be included in the cash collateral order without the consent of the Secured Creditors.

9.     Therefore, as discussed in more detail below, the Secured Creditors submit that: (i) the Great Wall Motion and requested priming lien must be denied; (ii) even should the Court consider the granting of a priming lien, it must be subordinate to the adequate protection liens of the Secured Creditors; and (iii) the latest version of the final cash collateral order proposed by the Debtors should be rejected by the Court.  In such circumstance, the Secured Creditors would be willing to continue to work with the Debtors to implement a sale process along the lines, and on the timeline, originally agreed to by the Debtors and embodied in the three interim cash collateral orders.

**BACKGROUND FACTS**

10.     Pursuant to that certain loan arrangement by and between Satcon Technology Corporation ("Satcon Technology") and its subsidiaries, and Silicon Valley Bank, the Senior Secured Creditor, as evidenced by among other documents, instruments and agreements, that certain Amended and Restated Credit Agreement dated as April 22, 2011, as amended by a certain First Amendment to Amended and Restated Credit Agreement dated as of June 30, 2011,

and as further amended by that certain Waiver and Second Amendment to Amended and Restated Credit Agreement dated as of August 9, 2011 (collectively, together with all the documents, instruments and agreements related thereto and in connection therewith the "Senior Prepetition Loan Documents"), made certain advances to the Debtors in accordance with the terms of the Senior Prepetition Loan documents.  The Senior Secured Creditor asserts and the Debtors have stipulated in the Interim Orders that the Senior Secured Debt is secured by substantially all of the assets of the borrowers, including the cash collateral.[9]  As of the Petition Date, the Debtors were indebted to the Senior Secured Creditor in the approximate amount of $14,536,165.05, plus accrued interest in the approximate amount of $88,896.89 and other fees, costs and expenses in the amount of $100,000.00; plus all other amounts as set forth in the Senior Prepetition Loan Documents; and plus post-petition interest, attorneys' fees and other amounts.

11.     Pursuant to that certain Venture Loan and Security Agreement between Satcon Technology and its Debtors' subsidiaries, Satcon Power Systems, Inc. and Satcon Electronics, Inc., as borrowers, and Compass Horizon Funding Company, LLC ("CHF"), CHF agreed to make certain loans and financial accommodations in a principal amount of up to $12 million dollars, evidenced by two secured notes payable.  By subsequent transfer agreements, CHF transferred (i) the secured note payable in the principal of $10,000,000.00 to Horizon Credit I LLC ("Horizon") and (ii) the secured note payable in the original principal amount of $2,000,000.00 to Velocity Venture Holdings LLC which in turn assigned such secured note

---

[9] The Official Committee of Unsecured Creditors (the "Committee"), in its Objection to the final cash collateral order, claims that the Secured Creditors may not be perfected in some of the Debtors' assets.  However, to date, no objection to the Secured Creditors claim has been made and the Debtor has stipulated to perfection in virtually all assets.  In any event, if the Committee's objection is a valid one, it is all the more reason for denial of the priming lien, as the Debtors rely on the Secured Creditors being perfected in all the Debtors' assets in arguing that there is a sufficient equity cushion in the Secured Creditors' collateral  to give them adequate protection for the proposed priming lien.

payable to Velocity Venture Funding, LLC (collectively, "Velocity"). The Subordinated Secured Creditors assert, and the Debtors have stipulated in the Interim Orders that, the Subordinated Debt is secured by substantially all of the assets of the Debtors, including the cash collateral. As of the Petition Date, the Subordinated Secured Creditors were owed the aggregate amount of $6,481,446.41 in principal, interest, fees, costs, and expenses, plus post-petition interest, attorneys' fees, and other amounts.

## DISCUSSION

**I.      PRIMING LIENS ARE IMPROPER WHERE ADEQUATE PROTECTION IS NOT GIVEN, WHERE REPLACEMENT LIENS ARE MERELY RECEIVED ON ITEMS ON WHICH THE SECURED CREDITORS ALREADY HOLD LIENS, AND ANY ADEQUATE PROTECTION PROPOSED BY THE DEBTORS IS ILLUSORY.**

12.     A priming lien cannot be allowed unless the Debtors have provided the Secured Creditors with the same level of protection they would have had if there had not been post-petition superpriority financing. *In re Swedeland Dev. Group*, 16 F3d 552, 564 (3d Cir. 1994 *en banc*). As this Court stated in the case of *LTAP U.S. LLLP* Case No. 10-14125-KG, 2011 WL 671761 at *3 (Bankr. D. Del. Fab. 18 2011), "priming is extraordinary relief requiring a strong showing that the loan to be subordinated is adequately protected." *See also* In re YL West 87th Holdings I LLC, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010). As this Court further noted in *LTAP*, a "replacement lien on assets against which it already has a lien is illusory. Debtor must provide [lender] with additional collateral, and there is none." The Debtors have the burden to establish that the Secured Creditors are adequately protected, and must make a "strong showing" to that effect. *See* 11 U.S.C. § 364(d); *LTAP* at *3. While the lenders in *Swedeland* and *LTAP* were undersecured, the cases clearly apply to any secured creditor whose collateral is being made the subject of a priming lien. Having a priming lien on assets already encumbered by the Secured Creditors' lien provides nothing and is simply illusory. Instead, the Debtors need to

9

show at least "tangible demonstration of adequate protection." *Id.* at *3.  That showing has not been made in this case.

13.    Courts must be particularly cautious when assessing whether the secured creditor to be primed is adequately protected, because superpriority financing displaces liens on which creditors have relied in extending credit and effectively deprives the secured lenders of their pre-petition benefit of the bargain.  *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *In re First Sav. Ass'n*, 820 F2d 710 (First Cir. 1987); *In re Shaw Industries Inc.*, 300 BR 861, 865 (W.D. Pa 2003); *In re Stoney Creek Technologies LLC*, 364 BR 882, 892 (E.D. Pa 2007) (the debtor did not meet the burden of demonstrating adequate protection where the debtor was not operating profitably, even where there was a substantial equity cushion in the collateral); in the Matter of TC Properties, LLC, 2002 WL 34536625 at *5 (Bankr. D. Neb).  As the Third Circuit has stated, "[T]he proposal should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing." *Swedeland* at *564.*  "A creditor is not protected by unsubstantiated projections of future success, especially when those projections are belied by [the debtor's] historical performance."  *Id*. at 566.

14.    As the Debtors acknowledged in the first day Declaration of their chief executive officer Charles S. Rhoades, the Debtors have not met their targets and have not met projections for well over a year, ultimately leading to the filing of their bankruptcy petitions on October 17, 2012 (the "Petition Date").  In just the six weeks since the Petition Date, the Debtors' projections for total receipts have been substantially off target: the Secured Creditors note the following projections of receipts, their actual recovery of receipts, and the corresponding variances:

| Week ending ("WE") | Projected Receipts | Actual Receipts | Variance |
|---|---|---|---|
| WE 10/20/12 | $2,833,600.00 | $2,893,153.00 | $59,553.26 |
| WE 10/27/12 | $1,786,000.00 | $1,376.402.75 | ($409,597.25) |
| WE 11/3/12 | $2,100,800.00 | $1,106,531.99 | ($994,268.01) |
| WE 11/10/12 | $2,348,860.66 | $703,908.15 | ($1,664,952.51) |
| WE 11/17/12 | $2,052,918.74 | $854,457.38 | ($1,198,461.36) |
| WE 11/24/12 | $2,655,274.90 | $711,261.13 | ($1,944,013.77) |

With the exception of the first week, the Debtors have consistently missed their collections targets by very significant amounts, missing their collections targets by more $6,000,000.00 in the aggregate since the Petition Date, and have demonstrated no ability to turn things around. The Debtors have been hemorrhaging money and are in an extremely precarious position. While the Debtors contend that they can package themselves for a going concern sale, the going concern values are based on highly speculative projections of dramatic increased future performance, when the Debtors have a track record of missing their projections by substantial amounts. The Debtors have not satisfied their burden to prove that any such projections are remotely reasonable, particularly in light of their continuing downward plummet. The Debtors' speculative plan to complete a "Hail Mary pass" is likely a pipe dream.

15.    Additionally, the Debtors have not made an adequate demonstration that the proposed agreement with Great Wall will enhance the value of the Debtors' business in exchange for the dramatic and unusual action of non-consensually priming the Secured Creditors' liens proposed by the Debtors. The Great Wall transaction boils down to the Debtors' recognition that Great Wall has them over a barrel and that the Debtors need to do whatever Great Wall requires them to do, whether or not it benefits the Estate. However, substantial value is leaving the

Debtors as a result of the relief requested in the Great Wall Motion, and all the Debtors get in return is net $3,800,000.00[10] of post-petition credit at a time that the Debtors have not demonstrated any ability to meet projections, to hit targets, or to conduct themselves in either a cash flow positive or profitable manner. The reality is that Debtors are incapable of providing adequate protection to the Secured Creditors for the potential damage to be caused by the priming lien in favor of Great Wall and by the effective distribution of over $6.2 million of the Debtors' assets to Great Wall for no consideration other than the valueless reduction of Great Wall's pre-petition general unsecured claim.

16.     The Debtors also ask this Court to retroactively withdraw and subordinate the adequate protection previously provided to the Secured Creditors on a consensual basis in the Interim Orders. Replacement liens granted to the Secured Creditors already secure at least $5.24 million of diminished collateral value, the amount by which the Debtors' accounts receivable aged less than 90 days have declined since the Petition Date. Any such retroactive revocation of adequate protection is barred by Section 364(e) of the Bankruptcy Code. The Secured Creditors relied on that adequate protection in good faith in agreeing to the consensual Interim Orders. It is neither fair nor permissible to retroactively strip the Secured Creditors of that adequate protection.

---

[10] The proposed agreement would permit Great Wall to reverse and re-apply post-petition payments of $1.2 million to Great Wall's pre-petition receivable, with the result that $1,200,000.00 of the $5,000,000.00 will be immediately be utilized as a result of that bookkeeping entry. .

## II.   THE PROPOSED GREAT WALL TRANSACTION RAISES MANY QUESTIONS REGARDING THE EXTENT TO WHICH IT WILL AFFECT THE ESTATE AND THE EXTENT TO WHICH IT IS IN THE INTEREST OF THE ESTATE

17.   The proposed settlement agreement with Great Wall provides *inter alia*, as follows:

- The Debtors acknowledge that they owe Great Wall "approximately" $26,200,000.00 for pre-petition unsecured obligations, without offset or counterclaim.

- Great Wall "and/or" Perfect Galaxy owed the Debtors approximately $1,300,000.00, on a pre-petition basis for parts and materials; that amount will be offset against Perfect Galaxy's pre-petition payable of $26.2 million.

- Perfect Galaxy and Great Wall "undertake to purchase" from the Debtors "up to" $5,000,000.00 worth of the Debtors' parts and material inventory in China and the Debtors' finished products located in China (at 85% of the Debtors' cost), which amounts would also be offset against the pre-petition payable.

- "Approximately" $1,200,000.00 paid by the Debtors on a post-petition basis to Perfect Galaxy will also be offset against the pre-petition payable.

- Perfect Galaxy will continue to ship and manufacture products consistent with its pre-petition "Manufacturing Agreement." The total outstanding credit post-petition advances will not exceed $5,000,000.00; the aggregate amount of the post-petition advances and the pre-petition payable will not exceed $26,000,000.00.

- No further post-petition payments will be required until the week ended January 12, 2013, at which time the Debtors will comply with a payment schedule providing for $3,300,000.00 of payments through March 18, 2103. Those payments will be allocated to the Pre-Petition Payable and shipped after the Petition Date. All outstanding post-petition credit will be paid in full no later than March 18, 2013.

- Perfect Galaxy and Great Wall are to receive a first priority priming lien on all assets of the Debtors to secure the Post-Petition Advances.

- The Debtors' intellectual property ("IP") concerning the products manufactured by Great Wall, namely "a compiled version in machine readable form of the software source code (.hex and .out files) for all inverter models and configurations comprised within the Finished Products," will be placed in escrow, with Perfect Galaxy and Great Wall to receive that IP out of escrow, *inter alia*, upon a liquidation of the Debtors.

18.     While the Debtors propose to stipulate that they owe Perfect Galaxy and Great Wall the pre-petition amount of $26.2 million, the Debtors have provided no evidence of the actual amount, and no evidence of whether or not the Debtors have potential offsets, including the recovery of preferential payments.  In Mr. Rhoades' first day Declaration (D.I. 4, ¶¶ 30, 31), Mr. Rhoades states that the Great Wall payable had grown to $46,000,000.00 at one point, and in 2012, when other efforts to reduce the payable were not successful (e.g. converting a substantial portion of the payable to equity), the Debtors began making extra payments of $1,250,000.00 per week to reduce that payable position.  According to Mr. Rhoades, by the end of September, 2012, the Debtors had reduced the payable from $46,000,000.00 to $26,000,000.00.   In his deposition, Mr. Rhoades testified that at least some of these payments were made within ninety (90) days of the Petition Date.  It is apparent that some, if not all, of these payments are likely avoidable preferential payments.   Certainly it is premature to acknowledge the debt in full without first exploring any preference claims against Perfect Galaxy or Great Wall.  Furthermore the set-off of the $1.3 million owed by Great Wall to Satcon pre-petition may be appropriate, provided it is a debt of Perfect Galaxy (which is owed the $26.2 million) and not another Great Wall entity (as the right to set-off requires mutuality).

19.     At the November 15, 2012 hearing, counsel to Perfect Galaxy/Great Wall argued that the Debtors were the only customer for his client, and that Perfect Galaxy/Great Wall would be forced to close their business unless some arrangement could be made with the Debtors.  *See* November 15, 2012 Hearing Transcript p. 80 ("Satcon is our only customer").  However, that is not correct.  According to Mr. Rhoades, the Debtors' CEO, Great Wall and Perfect Galaxy are part of the China Electronics Consortium, which is owned by the state of China, with over $30 billion of annual revenue.  Great Wall has a large number of factories and is the fourth largest

manufacturing contractor in the world. Thus it appears that the harm to Great Wall of not agreeing with the Debtor was substantially overblown at the November 15, 2012 hearing, and that Great Wall is trying to cram down a sweetheart deal that will effectively allow Great Wall to control the sales of the Debtors' products in China going forward, with or without the Debtors. Further, it was not disclosed to the Court at the November 15 hearing that Great Wall manufactures all of the inverters for sale in China at no charge to the Debtors and at its own cost; the Debtors owe nothing to Great Wall for the manufacture of China inventory, so no money is needed for Great Wall to manufacture that inventory.[11]

20.     The Debtors also fail to explain the logic or background of the agreement to allow Great Wall to apply $1.2 million of <u>post-petition</u> payments to Great Wall and Perfect Galaxy to satisfy a <u>pre-petition</u> unsecured claim. This is simply giving $1.2 million to Great Wall, as its pre-petition claim has minimal value, and it results in a like increase of the Debtors' post-petition payable to Great Wall because it was previously applied against post-petition purchases by the Debtors. As a result, that reallocation of funds eats up the first $1,2000,000.00 of the Debtors' proposed credit line with Great Wall, with the result that the transaction limits the Debtors to an additional $3,800,000.00 in post-petition credit before it hits the $5,000,000.00 estimate.

21.     Paragraph 4 of the settlement agreement provides for post-petition payments commencing the week ending January 12, 2013, and continuing through the week ending March 18, 2013, with total payments of $3,300,000.00 by the Debtors (see Paragraph 4 and Exhibit A to the settlement agreement). However, it should be noted that the future payments are to be made for "pre-petition payable… <u>and</u> for the Product shipped after the Petition Date" (emphasis added). It thus appears that Great Wall could apply the $3,300,000.00 of post-petition payments

---

[11] Great Wall manufactures the inverters at its own cost, then sells it to Great Wall's customers, with Great Wall receiving the payment, and only paying a royalty to the Debtors.

to the pre-petition unsecured claim, which would effectively strip those funds from the Debtors' estate, too.

22.    The provision in the agreement which effectively allows Great Wall to control the Debtors' source code is harmful to the Debtors' Estates, and provides still further value to Great Wall, because it effectively allows Great Wall to control the Debtors' market in China in the event of a liquidation sale or even certain going concern sales.  By having access to the source code, Great Wall would also have access to the Debtors' customers in China.  Indeed, it is quite interesting to note that the projections prepared by the Debtors and relied on by Lazard in its most recent "valuation," project no income over the next three years for sales of inverters in China, rather only steadily increasing royalty income from Great Wall (i.e. reflecting projected increasing sales of Satcon inverters by Great Wall, with Great Wall keeping all the proceeds except for the royalty payment to the Debtors).  In effect, through the transactions for which the Debtors seek court approval, the Debtors have simply turned over all of their sales in China to Great Wall.  The proposed agreement with Great Wall, together with Great Wall's control of the source code, could also lessen the incentive of Great Wall to be a potential bidder for the Debtors' assets, gives something of value to Great Wall in exchange for meaningless credits, and could chill the sale of the Debtors.

23.    Finally, other than a reference to the distribution agreement, the Debtors have not adequately explained to the Court or to interested parties precisely what the distribution agreement covers, what the prospects are going forward under the distribution agreement, how the financial terms of the distribution agreement would work for the Debtors, and how the financial terms work for Great Wall and for the Debtors.

24.     Thus it appears that property and cash worth substantially more than $5,000,000.00 is being stripped from the estate as part of the Great Wall agreement proposed by the Debtors, in exchange for net post-petition credit of $5,000,000.00, which is secured by a first priority priming lien, the first $1,2000,000.00 of which will be eaten up by the reallocation of the Debtors' post-petition payments to Great Wall.  This is not a case where such an agreement would substantially increase the going concern value of the Debtors and would enhance the Debtors' ability to enter into a going concern sale agreement.  Rather, there is a high degree of probability that the Debtors are destined to go out of business, without the benefit of a going concern sale.  The requested relief amounts to little more than permitting the Debtors to survive for a few more months, to permit the Debtors to bleed cash for a few more months, and then lead to the same, inevitable liquidation sale.

### III.     THE SECURED LENDERS FURTHER OBJECT TO THE PROPOSED FINAL CASH COLLATERAL ORDER

25.     The Secured Creditors object to the Debtors' form of proposed final cash collateral order.  First and foremost, the prior interim orders were entered on a consensual basis.  Therefore, the concessions granted by the Secured Creditors were part of an overall arrangement.  Without that context, the Secured Creditors withdraw their consent with respect to those terms.  Accordingly, no carve out for professional fees for the Debtors or the Committee may be included in the final cash collateral order without the consent of the Secured Creditors, nor can the Debtors deposit money in their counsel's account on a weekly basis towards the payment of the carve out.  Even more, no carve out for the proposed KEIP (scheduled to be heard later in December) may be included.

26.     The Debtors' proposed form of final cash collateral order continues to preserve the Debtors' "506(b) Rights", even where the Debtors' are arguing in the Great Wall Motion and the Cash Collateral Motion that the Secured Creditors are vastly oversecured.

27.     Other terms and conditions were materially modified by the Debtors in the proposed form of final cash collateral order in a manner unacceptable to the Secured Creditors. In the event that the Great Wall Motion is granted by the Court, the Secured Creditors do not contemplate consenting to the use of their cash collateral on the terms and conditions proposed by the Debtors.  If that motion is denied by the Court, and the Debtors are willing to reinstate the sale process embodied in the interim orders, the Secured Creditors are prepared to continue to work with the Debtors to implement that process on a consensual basis.

## **CONCLUSION**

In light of the foregoing, the Secured Creditors respectfully request this Court to deny the Debtors' Great Wall Motion and deny the Debtors' Cash Collateral Motion and terminate the Debtors' authority to continue to use the Secured Creditors' cash collateral, absent consent of the Secured Creditors.

Dated: November 27, 2012.

PEPPER HAMILTON LLP

/s/ David B. Stratton
David B. Stratton (DE No. 960)
David M. Fournier (DE No. 2812)
James C. Carignan (DE No. 4230)
1313 N. Market Street, Suite 5100
Wilmington, DE 19899-1709
Tel: (302) 777-6500

-AND-

WOMBLE    CARLYLE    SANDRIDGE    &
RICE, LLP

/s/ Steven K. Kortanek
Steven K. Kortanek (Del. Bar No. 3106)
Womble Carlyle Sandridge & Rice, LLP
222 Delaware Avenue, Suite 1501
Wilmington, DE 19801
Telephone (302) 252-4320
Facsimile: (302) 252-4330
E-mail: skortanek@wcsr.com

And

ROPES & GRAY LLP
James M. Wilton (*pro hac vice*)
Andrew G. Devore (*pro hac vice*)
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199-3600
Tel: (617) 951-7000
Fax: (617) 951-7050
Email: james.wilton@ropesgray.com
Email: andrew.devore@ropesgray.com

*Attorneys for Horizon Credit I LLC and Velocity Venture Funding, LLC*

1502342.4

Riemer & Braunstein LLP
Paul S. Samson (*pro hac vice*)
Donald E. Rothman (*pro hac vice*)
Steven E. Fox (*pro hac vice*)
Tel: 617-523-9000
Fax: 617-880-3456
psamson@riemerlaw.com
drothman@riemerlaw.com
sfox@riemerlaw.com

*Attorneys for Silicon Valley Bank*