IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| SATCON TECHNOLOGY | ) | Case No. 12-12869(KG) |
| CORPORATION, et al., | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |
| _____ | ) | **Re Dkt No. 139** |

## MEMORANDUM OPINION

The Court conducted an evidentiary hearing and argument over three (3) consecutive business days beginning November 28, 2012, on Debtors' Emergency Motion for Entry of an Order Authorizing (I) Entry Into a Settlement with Great Wall, (II) Incurrence of Post-Petition Trade Credit, and (III) Granting of a Priming Lien to Secure Post-Petition Trade Credit (the "Settlement Motion"); and the Motion of Debtors for Entry of Final Order Authorizing Use of Cash Collateral (the "Cash Collateral Motion"). At the conclusion of the hearing, the Court announced its ruling that it was approving the Motions, and would issue the opinion thereafter. The extreme urgency requires the Court to write quickly and briefly. Furthermore, because the Debtors have immediate need for funds but not wishing to impose unnecessarily on the District Court, the Court ruled on an oral stay motion that the Court's ruling is stayed for two days (later extended two additional days) to allow the appealing parties an opportunity to ask the District Court for a stay pending appeal.

### Jurisdiction, Venue, and Statutory Predicates

The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this district pursuant to 28 U.S.C. § 1408. This matter is core within the meaning of 28 U.S.C. § 157(b)(2).

The statutory predicates for the relief sought herein are sections 105, 362, 363, 364, 1107 and 1108 of the Bankruptcy Code and Bankruptcy Rules 6003, 6004(h) and 9019.

## General Background

On October 17, 2012 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

The Debtors provide utility-grade power conversion solutions for the renewable energy market, primarily for large-scale commercial and utility-scale solar photovoltaic markets. The conversion solutions that the Debtors design and deliver enable producers of renewable energy to convert clean energy into grid-connected, efficient and reliable electrical power. The Debtors' power conversion solutions boost total system power production through system intelligence, advanced command and control capabilities, industrial-grade engineering and total lifecycle performance optimization. The Debtors also offer system design services and solutions for management, monitoring and performance measurement to maximize capital investment and improve overall quality and performance over the entire lifespan of a photovoltaic installation. The Debtors sell their products throughout the world, although their current primary markets are North America and Asia.

Since the beginning of 2011, European governments have eliminated subsidies for solar power projects causing the Debtors' European business to almost entirely disappear while the North American and Asian markets have experienced increased competition and dramatically falling prices.

During the latter part of 2011 and all of 2012, the Debtors felt pressure to reduce their outstanding obligations to trade creditors and secured and unsecured lenders. The Debtors reduced their total funded indebtedness, bank debt, trade payables and accrued expenses from approximately $157,000,000 as of the end of June of 2011 to approximately $72,000,000 at the end of June of 2012.

This debt reduction resulted in the Debtors' cash position dropping from approximately $46,000,000 to approximately $3,000,000 for the same periods. The Debtors' reduced cash position began to materially impair their ability to pay their vendors and lenders and as a result the Debtors began to experience difficulty shipping product to their customers on a timely basis.

As a result of these liquidity and operational issues, the Debtors have been unable to operate at a profitable or even cash flow neutral basis for a significant period of time. The Debtors also have been unable to meet the debt service obligations on their funded debt and did not have sufficient liquidity to continue operating outside of chapter 11.

### **Secured Lenders**

Silicon Valley Bank (the "Senior Secured Creditor") and Horizon Credit I LLC and Velocity Venture Funding, LLC (together, the "Subordinated Secured Creditors," and with the Senior Secured Creditor, the "Secured Creditors"), are purported secured lenders of Satcon. As of the Petition Date, Satcon owed them approximately $14.7 million and $6.5 million, respectively.

### **Witnesses**

At the hearing the Court had the benefit of testimony from the following witnesses:

- Aaron Gomolak, Debtors' Chief Financial Officer, Executive Vice-President and Treasurer ("Gomolak" and "Gomolak Testimony").

- Charles S. Rhoades, Debtors' President and Chief Executive Officer "Rhoades" and "Rhoades Testimony").

- Andrew Torgove, managing director of Lazard Middle Market, retained by Debtors to evaluate strategic alternatives and render financial advisory services ("Torgove" and "Torgove Testimony").

- Edward A. Zimmerlin, Senior Vice-President of Hilco Appraisal Services, LLC, who testified on behalf of the Secured Lenders concerning the Liquidation Value ("Zimmerlin" and Zimmerlin Testimony").

- Gabriel F. Fried, CEO of Hilco Streambank, who testified on behalf of the Secured Lenders concerning an intellectual property and intangible asset value ("Fried" and "Fried Testimony").

### Great Wall - Creditor, Supplier and Customer

China Great Wall Computer Shenzhen Co., Ltd, ("CGW") and Satcon Technology Corporation ("STC") entered into an agreement (the "Contract Manufacturing Agreement"), dated February 6, 2012, pursuant to which CGW and its subsidiary Perfect Galaxy International Limited (collectively "Great Wall"), agreed to manufacture and supply certain products and sub-assemblies for Debtors (collectively "Satcon"). Under the Contract Manufacturing Agreement, Satcon orders product as needed under purchase orders provided to Great Wall. Great Wall then manufactures and delivers the products to Satcon.

Satcon benefits from its relationship with Great Wall because Satcon does not have to maintain expensive manufacturing facilities, equipment and machinery, purchase costly raw materials or maintain a specialized work force. Satcon can focus on technology development, product design and sales and marketing while relying on Great Wall to provide cost-effective and reliable manufacturing.

Great Wall is the Debtors' primary contract manufacturer and supplies approximately 90% of the products and sub-assemblies used in the Debtors' business. The Debtors do not have an alternative manufacturer that could supply the majority of these products. In the absence of a continuing relationship with Great Wall, the Debtors would be unable to operate their business. As such, maintaining agreeable trade terms with Great Wall is vital to the continuation of the Debtors' business.

Prior to the Petition Date, the Debtors owed Great Wall approximately $26.2 million for product that had previously been delivered to Satcon (the "Prepetition Payable") and Great Wall owed Satcon approximately $1.3 million for parts and materials purchased from Satcon. Great Wall has informed the Debtors that they are unwilling to extend credit in excess of $26 million to the Debtors. Thus, in order to continue to receive product from Great Wall, the Debtors would be forced to operate on cash-on-delivery terms with Great Wall. While the Debtors expect that Great Wall would continue to supply the Debtors on a cash-on-delivery basis for the short-term, the Debtors believe that absent a settlement Great Wall will not be willing to procure parts to enable the Debtors' to operate.

## The Cash Collateral Order and the Need for Liquidity

In addition to the issues posed by its relationship with Great Wall, the Debtors' ability to maximize the value of their estates is challenged by the Debtors' lack of liquidity. The Debtors do not have debtor-in-possession financing in these cases. Rather, they are operating on cash collateral subject to the *Third Interim Order (I) Authorizing the Use of Cash Collateral, (II) Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361, 362, 363 and 507 and (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001 (b) and Local Rule 4001-2* (together with any other order granting use of Cash Collateral, the "Existing Cash Collateral Order") which limits the Debtors' ability to use Cash Collateral (as defined in the Cash Collateral Order) to an agreed existing budget.

The Existing Cash Collateral Order provides for sale milestones that require the Debtors to conduct an auction for their assets on or prior to January 15, 2013 and obtain a sale order approving a sale on or before January 17, 2013. The Debtors are in the process of marketing their assets but are concerned that the short milestones will make it difficult to maximize value primarily due the

strategic nature of the likely buyers. The Debtors' investment bankers want an extension of the sale process for an additional 45 to 60 days that would benefit the Debtors' estates and increase amounts for distribution to the Debtors' constituents.

## Settlement With Great Wall

After extensive arm's length negotiations, the Debtors and Great Wall reached an agreement. Pursuant to the terms of the settlement between the Debtors and Great Wall, Great Wall would offset the approximately $1.3 million Great Wall owed to the Debtors prepetition against the Prepetition Payable. Great Wall would also agree to purchase certain of the Debtors' spare parts inventory currently located in China on an as needed basis and would purchase certain inventory by offsetting the purchase price against the Prepetition Payable. It is anticipated that these purchases and the resultant offset would be approximately $5,000,000. The settlement also contemplated the application of three of the Debtors' post-petition payments aggregating approximately $1.2 million to the Prepetition Payable. As a result of these transactions, the Prepetition Payable would be reduced to approximately $18.7 million.

Great Wall would then be willing to provide the Debtors with trade credit. Great Wall would agree to ship product to the Debtors consistent with their prepetition relationship. Through the week ended March 9, 2013, the Debtors estimate Great Wall would ship them approximately $8,214,000 of product. The Debtors would make no payments to Great Wall for the initial shipments of product until January 2013. Beginning in January 2013, the Debtors would begin paying Great Wall pursuant to an agreed payment schedule. Based on the Debtors' projections, the Debtors would receive approximately $4.9 million in post-petition trade credit (the "Postpetition Advances") through the week ended March 9, 2013 with the total balance owing to Great Wall at that time approximating

$23.8 million. Pursuant to the settlement, Great Wall would receive a first priority priming lien (the "Priming Lien") on the assets of the Debtors to secure the Postpetition Advances subject only to the Carve-Out (as defined in the Final Cash Collateral Order). Great Wall would also receive certain protections with regard to the intellectual property necessary to allow for sale and servicing of the inventory purchased by them in the event Satcon is not in a position to service such inventory.

The Court finds that the Settlement with Great Wall provides Debtors with numerous benefits. A continuing relationship with Great Wall, will enable Debtors to continue to operate their businesses and avoid immediate liquidation.

The settlement with Great Wall also provides the Debtors with additional liquidity to support their chapter 11 cases and to allow for a full and complete marketing process for the Debtors' assets. The Settlement will extend the sale process and expand liquidity.

### **Impact on Secured Creditors**

As discussed below, the Court finds that the Secured Creditors are more than adequately protected for the limited Priming Lien requested by Great Wall. The total claims of the Secured Creditors as of the Petition Date totaled $21,202,620.35 (inclusive of interest and other fees). The Secured Creditors benefit from an equity cushion of at least $10.5 million based on the liquidation value of the Debtors' assets.

### **The Debtors Should Be Permitted to Enter into the Settlement With Great Wall**

Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). Additionally, Bankruptcy Code section 105(a) allows this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the

Bankruptcy Code]." 11 U.S.C. § 105(a).

Bankruptcy Rule 9019 empowers the Court to "approve a compromise or settlement." *See* Fed. R. Bankr. P. 9019(a). *See, also, Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc.* v. *Anderson,* 390 U.S. 414, 424 (1968); "To minimize litigation and expedite the administration of a bankruptcy estate, '[c]ompromises are favored in bankruptcy'." *Myers* v. *Martin (In re Martin),* 91 F.3d 389, 393 (3d Cir. 1996). A court must determine that the proposed settlement is in the best interest of the debtor's estate. *In re Martin,* 91 F. 3d at 394; *In re Marvel Entm't Group, Inc.,* 22 B.R. 243, 249 (D. Del. 1998) ("[T]he ultimate inquiry is whether 'the compromise is fair, reasonable, and in the interest of the estate.'"). Bankruptcy courts typically weigh the following factors, enunciated in *Martin:* (a) the probability of success in litigation; (b) the likely difficulties in collection; (c) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (d) the paramount interests of the creditors.

The testimony provided by Gomolak, Rhoades and Torgrove supports the benefits of the Settlement. Therefore, the Court finds that the Debtors have properly exercised their business judgment, and further finds that entry into the settlement with Great Wall is reasonable and in the best interests of their estates. The Debtors have carefully considered and analyzed the terms of the settlement, and in light of the circumstances described herein, have concluded that entering into the settlement is in their best interest and will maximize the value of the Debtors' estates for the benefit of all of the Debtors' constituents.

Most importantly, entering into the settlement will allow the Debtors to continue to operate their business and avoid an immediate liquidation which would negatively affect virtually all of the Debtors' constituents and eliminate around 100 jobs. Absent an agreement with Great Wall, the

Debtors have no confidence that Great Wall can or will continue to provide the Debtors' product and other necessary services on a going-forward basis. Entry into the settlement is the only way the Debtors can have confidence that the relationship with Great Wall will remain stable in the future.

The Debtors will also clearly benefit from the additional liquidity being provided by Great Wall for the reasons set forth above.

Another fact which favors settlement is that Great Wall is a Chinese corporation. Any order compelling Great Wall to continue to supply the Debtors with product, would require litigation to seek the enforcement of such an order in a Chinese court, without any guarantee of success. Such a success would be illusory because the delay would cause irreparable damage to the Debtors' business.

The Debtors have also agreed to satisfy approximately $7.5 million of the Prepetition Payable through a combination of (a) a $1.3 million set off of a pre-petition receivable from Great Wall, (b) a non-cash purchase of inventory and spare parts by Great Wall, and (c) three post-petition payments totaling approximately $1.2 million that will be applied to the Prepetition Payable. Reduction of the Prepetition Payable in this manner is justified as doing so is necessary to avoid immediate and irreparable harm to the Debtor's business operations.

### The Debtors will Grant Great Wall a Priming Lien on all of the Debtors' Assets to Secure the Postpetition Advances

The Debtors are requesting authority to grant Great Wall a Priming Lien on all of the Debtors' assets to secure the Postpetition Advances. Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the Bankruptcy Court may

authorize the debtor to obtain credit or incur debt. *See* 11 U.S.C. § 364(c). Debtors are currently unable to obtain credit under the provisions of section 364( c), and therefore are seeking authority pursuant to section 364(d) to grant Great Wall a Priming Lien in exchange for the Postpetition Advances.

The Secured Creditors did not provide any additional liquidity other than the use of Cash Collateral. Great Wall has agreed to provide the trade credit contemplated in the Motion but only if they obtain a Priming Lien. Further, the Debtors, through their financial advisors, have sought to find potentially interested financial parties in an effort to procure post-petition financing. The Debtors have contacted seventeen asset based lenders about providing financing to the Debtors. Of those, twelve of the lenders declined to participate. Five of the lenders have expressed interest in potentially providing financing but only one has provided a term sheet. That term sheet contains a number of conditions that the Debtors are not currently able to satisfy. In the event the Debtors are able to obtain financing, nothing in the Great Wall settlement is inconsistent with the Debtors obtaining additional post-petition financing from a third-party. Thus, undertaking this financing is consistent with the Debtors' obligation to seek to maximize the value of its assets for the benefit of their constituents.

The Debtors submit that the value of the Secured Creditors' interests in the Debtors' collateral far exceeds the value of their claims. The equity cushion permits the priming of the Secured Creditors' liens as adequately protected to the extent Great Wall provides Postpetition Advances.

Section 364(d) of the Bankruptcy Code permits a debtor to incur debt secured by a senior, or "priming" lien. Specifically, section 364(d)(1) provides that:

(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

    (A) the trustee is unable to obtain such credit otherwise; and

    (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

What constitutes adequate protection must be decided on a case-by-case basis. *See In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985); *In re Shaw Indus., Inc.*, 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003). The focus of this requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use by the debtor. *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.").

As stated above, adequate protection protects a pre-existing lienholder against a decrease in the value of its collateral. *See, e.g., In re Planned Systems, Inc.* 78 B.R. 852, 861-62 (Bankr. S.D. Ohio 1987). This standard applies equally with respect to a proposed "priming" financing under Bankruptcy Code section 364(d)(1)(B). *See, e.g., In re Elmira Litho, Inc.*, 174 B.R. 892, 904 (Bankr. S.D.N.Y. 1994) ("An equity cushion, therefore, provides adequate protection if it is sufficiently large to ensure that the secured creditor will be able to recover its entire debt from the security at the completion of the case."); *In re McKillips*, 81 B.R. 454, 458 (Bankr. N.D. Ill. 1987) ("Case law has established that the existence of an equity cushion may, in and of itself, constitute adequate

protection for an over-secured creditor.")

### The Secured Lenders Are Adequately Protected

The Debtors have agreed to provide adequate protection to the Secured Lenders in the form of (I) interest payments at the applicable default rate, (ii) payment of the Secured Lenders' legal fees and expenses incurred in these chapter 11 cases and (iii) replacement liens on the Collateral, as defined in the Cash Collateral Orders.

Lazard prepared a Valuation Analysis in which Lazard estimates that the Debtors' total enterprise value is between $36,000,000 and $42,000,000. Torgrove Testimony, Ex. 8. The Debtors have prepared a liquidation analysis, which estimates the value basis of the Debtors' assets to be at least $32 million. Rhoades Testimony, Gomolak Testimony, Exs. 5&6. Both of these analyses demonstrate a significant equity cushion. The Secured Lenders presented contrary evidence through their retained experts at Hilco. The Court finds the Hilco opinion to be less credible than Debtors because Hilco did not include substantial assets, including international goods and work in progress. Ex. I.

The Court finds that the Projections are reasonable and achievable.

### The Aging of the Debtors' Receivables Does Not Represent a Diminution in the Value of the Secured Lenders' Collateral

The Secured Lenders assert that the value of their collateral has diminished by $5.24 million since the Petition Date based on a reduction in the value of the Debtors' accounts receivable aged less than ninety (90) days. Objection, ¶ 16. The Debtors explained the disparity. The Debtors' accounts receivable aged less than ninety (90) days has reduced not because the Debtors have received payment for such receivables and not replaced them with new customer orders but because

the Debtors have yet to collect these amounts so they have aged beyond ninety (90) days. Gomolak Testimony. Further aging of the Debtors' accounts receivable since the Petition Date does not represent a diminution of value of the Secured Lenders' collateral. The value of these receivables as collateral is an issue of collectability, not age.

As explained by Gomolak, the Debtors' normal collection cycle of receivables has averaged 122 days since the beginning of 2011. Gomolak Testimony. Accordingly, it is not unusual for the Debtors to have receivables outstanding for more than ninety (90) days and there is no basis for the Secured Lenders' assertion that such receivables have less value for adequate protection purposes than receivables outstanding for less than ninety (90) days. *Id.*

## **CONCLUSION**

For the foregoing reasons and based upon the evidence presented to the Court, the Settlement Motion has been granted and the Order granting the Cash Collateral Motion is pending.

Dated: December 7, 2012

_____
KEVIN GROSS, U.S.B.J.